HUDSON RIVER WOOLEN MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8523. Promulgated December 27, 1927.

*Wilton H. Wallace, Esq.*, and *B. B. Pettus, Esq.*, for the petitioner. *J. L. Deveney, Esq.*, for the respondent.

## OPINION.

MORRIS: The first allegation of error urged by the petitioner relates to the action of the respondent in increasing the depreciation reserve, thereby decreasing invested capital of petitioner for the taxable years in question. The respondent, in making his examination for the years 1917 to 1919, found that inadequate depreciation had been taken by the petitioner in years prior to 1917 and he thereupon recomputed depreciation on machinery and buildings from January 1, 1893, which computation resulted in an increase in the depreciation reserve of $20,153.27, which, in computing the petitioner's invested capital for the year in question, he included in the reserve for depreciation.

Petitioner relies upon the *Appeals of Rub-No-More Co.*, 1 B. T. A. 228; *Cleveland Home Brewing Co.*, 1 B. T. A. 87; and *Russell Mill-*

*ing Co.*, 1 B. T. A. 194, in support of its contention. The respondent, on the other hand, contends that the *Appeal of City National Bank*, 2 B. T. A. 623, is controlling.

On account of the paucity of evidence bearing upon this issue it is impossible for us to determine just what amounts were charged off by the petitioner in the earlier years of its existence. The petitioner's witness, when asked what, if any, depreciation was charged off in the earlier years, replied:

Negligible amounts; some years I did not charge off anything at all; I do not believe—in one year it exceeded $2,000, but in most of the years it was about $1,500.

In the cases relied upon by the petitioner the Board found that there was sufficient evidence that the taxpayer had charged off depreciation in prior years and that such depreciation was substantially correct, therefore, the depreciation as computed by the taxpayers in those cases was not disturbed. In the *Appeal of City National Bank*, *supra*, on the other hand, the Board found that depreciation taken by the taxpayer from 1907 to 1918 was inadequate and, therefore, the respondent was permitted to recompute said depreciation for those years.

It does not appear from the evidence that the petitioner had any settled policy with respect to depreciating its assets prior to the enactment of the income-tax laws, nor does it appear that the amounts charged off in the earlier years of its existence are substantially correct. The respondent's action in increasing the petitioner's depreciation reserve by the amount of $20,153.27 is, therefore, approved.

The second allegation of error urged by the petitioner relates to the disallowance by the respondent of the sum of $160,811.16 from invested capital for the years in question. This figure of $160,811.16 was arrived at by taking the appraisal values at March 1, 1913, of buildings and machinery in the total sum of $218,612.56 and deducting therefrom the cost value of buildings and machinery as reflected in the books of account of the petitioner at March 1, 1913, of $57,801.40.

Section 326 (a) of the Revenue Act of 1918 provides:

(a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section:

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment; * * *

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year.

What evidence have we of the "actual cash value" of these assets "at the time of such payment." The appraisal made in 1918 as of March 1, 1913, is clearly not proper evidence of value for invested

capital purposes, under the decision in *La Belle Iron Works* v. *United States*, 256 U. S. 377, and similar decisions, nor do we understand that it was urged as such. The only testimony that we have on the subject is that of Mendelsohn, treasurer of the petitioning company, that although there were no offers to purchase the business at or about the time of incorporation of the petitioner, there was an offer to make a loan of $30,000 on the property that was left after the fire, which loan was never consummated, but Mendelsohn did not testify, nor did anyone else, as to what the parties who were to make this loan considered the cash value of the petitioner's property to be which was to secure this loan. We do not consider that this evidence is of any value to us in determining " actual cash value " of the assets of the petitioner at the time they were taken over in 1892.

With respect to assets acquired and improvements made subsequent to incorporation, we have the testimony of Mendelsohn that between 1893 and 1918, the petitioner made extensive alterations and improvements and that the costs of some of those improvements were charged to profit and loss at the time. It is true that we have been shown by certain plats offered in evidence that these alterations and improvements were made, and that only about $16,000 thereof had been capitalized, but we have not been shown by an analysis of the profit and loss account to which capital items have been erroneously charged just what amount should have been capitalized, nor did the witness have any definite idea how much the items that were not capitalized amounted to.

During the course of the hearing, while Mendelsohn was identifying the additions to the mill account from the books of account of the petitioner, a charge of $4,766.89 was found to have been made in 1895. The testimony with respect to this item was:

Q. What is that $4,700; what does that represent?
A. I think that was part of the cost of the large addition.
Q. Of the large addition to what—
A. To the main building.
Q. To the main building?
A. Yes, sir; that is as far as my recollection goes.
Q. But, the cost of the main building was greater than $4,700?
A. It was much greater; that covered the brick work and the foundations and the roof, and all the rest of it was done by labor that we employed by the day, by the week and by the year.
Q. That addition to the main building—how much do you think the total cost was?
A. It was possibly more than twice the amount—it was surely more than twice the amount; I could not say what the exact cost was.

The above testimony as to an event occurring 30 years ago, uncorroborated by other testimony, is entirely too general and indefinite in its character for us to find as a fact that the building referred to

when originally built cost $9,400 and that $4,700 thereof was charged to profit and loss. It will be noted from the above testimony that the witness does not state that the amount greater than $4,700 was not capitalized, nor that it was charged to profit and loss. He simply says that the amount appearing in the account was $4,766.89 and to the best of his recollection that represented a part of the cost of the main building and furthermore, that the cost of the building was twice as great as the amount shown in the books of account. We do not know, except by inference, whether or not he meant to say that the entire cost had not been capitalized. The original entries covering the erection of this building should have been put in evidence and the witness should have definitely stated as a fact that a portion of the cost thereof had been charged to profit and loss, and that account should have been analyzed to determine the correct amount to be capitalized. We can not, therefore, sustain the contentions of the petitioner with respect to this item on the evidence offered.

The witness, Mendelsohn, testified further that the petitioner constructed a large reservoir to supply it with water gathered from nearby wells and springs, the cost of which construction exceeded $5,000, all of which was charged to profit and loss. Undoubtedly if the petitioner expended $5,000 or more in the construction of this reservoir, it should have been added to its capital account and should not have been charged to profit and loss, but with the meager amount of evidence that we have, we are unable to make any appropriate findings for the taxable year in question with respect to this item. We are not informed of the nature of the construction of this reservoir, we do not know the date when it was completed, nor do we know what would be a proper rate of depreciation to apply in depreciating this asset down to the taxable year and without all this, we are unable to say what amount, if any, should be added to invested capital for the taxable year under consideration.

Considering the clear and unmistakable terms of section 326 of the Revenue Act of 1918 and the decided cases thereunder, we are unable to sustain any additions to the invested capital as computed by the respondent.

With respect to the third allegation of error, counsel in his opening statement said it dealt with improper reduction of invested capital on account of income and profits taxes for prior years, that prior years had not been closed, and pending claims if allowed would have an effect upon the invested capital for the taxable year. No evidence was introduced on this point, and in the absence thereof, we are unable to make any determination with respect to the error alleged.

As to the fourth allegation of error, the petitioner and respondent entered into a stipulation at the hearing of this case as follows:

That it is agreed that during the taxable year this taxpayer received $545.54, representing interest received during the taxable year upon United States Certificates of Indebtedness, and that interest upon the principal sum of $5,000, namely $225.00 is exempt, leaving the amount taxable $320.00.

The fifth allegation of error with respect to relief under the provisions of sections 327 and 328 of the Revenue Act of 1918 was waived by the petitioner at the hearing.

The sixth allegation of error urged by the petitioner is the failure of the respondent to allow a March 1, 1913, value of $160,811.16 for depreciation purposes. This allegation of error is not entirely clear, but it seems that what the petitioner is contending for is a depreciation allowance upon a value of $61,726.95 in excess of that allowed by the respondent, which is the difference between $160,811.16, the figure hereinabove explained, and $99,084.21, the excess value for depreciation purposes allowed by the respondent over the value shown in the books of account.

Section 214 (a) of the Revenue Act of 1918 provides:

That in computing net income there should be allowed as deductions:

\* \* \* \* \* \* \*

(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

In order to dispose of this allegation we must determine whether the values found by the appraiser, namely $102,620 for buildings and $115,992.56 for machinery, represent the fair market values of the properties in question at March 1, 1913.

The appraisal in question was made by an expert appraiser in 1918 as of March 1, 1913. The appraisal report was offered in evidence and received as an inventory of the assets of the petitioner as of the time the appraisal was made—the appraiser was then questioned as to whether the figures identified in that report, in his opinion, represented the " fair market value " at March 1, 1913, and he stated that they did. The testimony of this appraiser was the sole evidence on the subject of fair market value at March 1, 1913. We must, therefore, determine from his testimony whether the " reproductive " costs used by him in reaching his conclusions are the same as " fair market value " at March 1, 1913. In considering the question of "market value " in *Chicago Railway Equipment Co.* v. *Blair, Commissioner*, 20 Fed. (2d) 10, the Circuit Court of Appeals said:

Market value, speaking very generally, may be said to be the price which one, under no compulsion, is willing to take for property which he has for sale, and which another, under no compulsion, being desirous and able to buy, is willing to pay for the article. But market value is so dependent upon times, places, conditions, and people that that which is a good rule in one case may be no rule under other circumstances. For instance, staple articles of merchandise,

such as fuel, clothing, or food, at most times and places have a well-known market value; but the market value of plants used for manufacturing purposes, or buildings equipped for special business or commercial purposes, are affected by many conditions.

While the appraiser testified that the figures in his appraisal represented "fair market value," we also have his testimony as to how he arrived at his figures in great detail. Let us see if he has taken into consideration the "many conditions" which enter into the determination of market value as applied to manufacturing plants similar to the petitioner. The witness stated that the depreciated value is determined, first, by determining whether the machine had been improved upon, whether there is another machine that does better work more economically; secondly, the present condition is determined, that is, working condition; and, thirdly, the wear and tear that the machine has been subjected to—he then determines the cost of the machine, where that is possible of ascertainment, on the day to be used as a starting point, in this case, March 1, 1913. From the price so determined, depreciation is deducted. In the case of buildings, the building is measured and the number of bricks and the amount of labor entering into the construction are determined, applying the costs of materials and labor at March 1, 1913, the cost to reproduce that building as of that date is determined. If the particular asset has been in use for three years prior to March 1, 1913, he would deduct three years' depreciation in arriving at reproductive cost at that time.

It must be borne in mind that the market value which we are attempting to determine is not the value of a particular machine or building or of a group of machines or buildings as such—our problem is to determine whether we have before us sufficient evidence to say that the values found by the appraiser in the manner described are the "fair market values" of a manufacturing plant actively engaged in the conduct of woolen business. Certain elements affecting fair market value were considered by the appraiser in arriving at his value of the machinery at March 1, 1913, but other factors, which we consider essential, were disregarded.

In the Appeal of Rockford Malleable Iron Works, 2 B. T. A. 817, where the taxpayer sought to prove the March 1, 1913, value of its depreciable assets by the introduction of a retrospective appraisal based upon reproductive costs less depreciation, the Board held that such evidence was insufficient. In that case the Board, after citing with approval the Appeals of Valley Steamship Co., 1 B. T. A. 1107, and Kinsman Transit Co., 1 B. T. A. 552, said:

The value of property on March 1, 1913, is its actual value on that date, and the valuation can not be determined by any sort of theoretical computation, even

though that theoretical computation starts with a reproductive value based upon cost of similar property. Value is a real, actual, definite thing, and, in many instances, cost or depreciation, or both, have very little to do with it. Value is what the property is worth. It is what it would bring in the open market if offered for sale by an owner willing, but not compelled, to sell to a purchaser willing, but not compelled, to buy. Value is frequently affected by things far removed from depreciation or cost. * * * Value results largely from demand or earning power, which may or may not be the same thing. It is commonly affected by periods of prosperity or financial depression.

In this case, the appraisal figures, determined as heretofore explained, form the basis for the witness' testimony as to "fair market value" at March 1, 1913, which was all the testimony offered on the subject. The appraisal was made for insurance purposes and not with the intention of establishing the fair market value of a plant actively engaged in the woolen manufacturing business, and is naturally concerned only with what it will cost the company to rebuild and reequip its plant at a given time in the event of destruction, either partially or wholly, by fire. It does not take into consideration the economic conditions with respect to the business itself nor with respect to the industry as a whole—in short, the economic law of supply and demand at March 1, 1913, has had no consideration whatsoever. In 1913 there may have been little or no demand for the business or the types of machines and buildings owned by the petitioner, in which event, of course, the fair market value at that time would be very low; if, on the other hand, there was a great demand, the inverse of that proposition would be true. The witness was asked during the course of the hearing, "Assume you have the total number of bricks which enter into this building—assume you have the price of labor for the laying of the bricks and all of the other prices that go into the construction of that particular building—assume you are making your appraisal as of March 1, 1913, would you say that the total of those various items—bricks, labor and lumber and whatever goes into that building, would constitute the fair market value of that building on March 1, 1913?" And the witness replied, "Yes, sir."

Considering the uncorroborated testimony of the witness and the decisions of the Board on the subject, we are of the opinion that the values contended for by the petitioner have not been properly established by the evidence. Therefore, the respondent's determination with respect thereto is approved.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by Murdock and Siefkin.